IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

GEORGE W. MOTSINGER, JR., )
)
        Plaintiff, )
)
vs. ) Case No. 17-cv-766-JPG-CJP
)
COMMISSIONER of SOCIAL SECURITY, )
)
        Defendant. )

**MEMORANDUM AND ORDER**

In accordance with 42 U.S.C. § 405(g), plaintiff George W. Motsinger, Jr., represented by counsel, seeks judicial review of the final agency decision denying his application for Child Disability Benefits and Supplemental Security Income (SSI) benefits under 42 U.S.C. § 423.

**Procedural History**

Mr. Motsinger applied for benefits in August 2013 alleging disability beginning on August 28, 1995[1]. After holding an evidentiary hearing, Administrative Law Judge (ALJ) Stuart T. Janney denied the application on April 29, 2016. (Tr. 10-27.) The Appeals Council denied review, and the decision of the ALJ became the final agency decision subject to judicial review. (Tr. 1.) Administrative remedies have been exhausted and a timely complaint was filed in this Court.

**Issues Raised by Plaintiff**

Plaintiff raises the following points:

1. Whether the ALJ's residual functional capacity (RFC) assessment is supported by substantial evidence where he failed to account for all of Motsinger's impairments and attendant limitations and based the assessment on his own lay impression of the medical evidence.

2. Whether the ALJ improperly evaluated Motsinger's subjective symptom allegations where the ALJ's rationale was illogical, unexplained, and legally insufficient.

---

[1] The alleged date of onset is plaintiff's date of birth. Regardless of the date of onset, if he were to be found disabled, he would be entitled to benefits only as of the date on which he applied. 20 C.F.R. § 416.335; 42 U.S.C. § 1382(c)(2).

## Applicable Legal Standards

Plaintiff applied for Child Disability Benefits on the earnings record of his deceased mother. As is relevant to plaintiff, a child of an insured person who has died is eligible for benefits if he is age eighteen or older and has a disability that began before he turned twenty-two. 20 C.F.R. § 404.350(a).

To qualify for Child Disability Benefits or SSI benefits, a claimant must be disabled pursuant to the Social Security Act. The Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).[2] The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

---

[2] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423 *et seq.* and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c *et seq.* and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925, which details medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but that the impairment is neither listed in nor equivalent to the impairments in the regulations—failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant is capable of performing *any* work within the economy, in light of the claimant's age, education, and work experience. If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id.*; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## The Decision of the ALJ

ALJ Janney followed the five-step analytical framework described above. Plaintiff had never worked. The ALJ found that plaintiff had severe impairments of amblyopia ("lazy eye"), myopia, and

astigmatism with decreased visual acuity; level 3 obesity; history of ear traumas and infections; learning disorder and borderline intellectual functioning; and obstructive sleep apnea. At this step, the ALJ determined that plaintiff had moderate difficulties in ability to maintain concentration, persistence or pace.

The ALJ found that Mr. Motsinger had the RFC to perform work at the sedentary exertional level with some physical and mental limitations. The mental limitations were that plaintiff was limited to understanding, remembering, and carrying out short, simple instructions at a consistent pace, but not complex instructions.

Based upon the testimony of a vocational expert (VE), the ALJ found that plaintiff was not disabled because he was capable of performing jobs that exist in significant numbers in the national economy.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

**1.      Agency Forms**

Plaintiff was born on August 28, 1995. (Tr. 230.) He graduated from high school in May 2013. He was in special education classes. (Tr. 235.) His sister, with whom he lived, stated that he had very bad eyesight and struggled to see even with glasses. He could not see well enough to drive. He had a learning disability and was "only at a 3rd or 4th grade level." (Tr. 245.)

The transcript contains some records from plaintiff's high school. A report dated March 2013 (his senior year) states that plaintiff "performs below grade level in all academic areas adversely

affecting education in the regular education classroom." He had a "speech problem," and his eyesight was also a weakness. He had become "extremely independent" while in high school and completed his work on time and with accuracy. (Tr. 268.)

A school guidance counselor filled out a form at the agency's request in September 2013. The form asked the teacher to rate the student's functioning in specific areas using a five-point scale ranging from "no problem" to "a very serious problem." She stated that she saw plaintiff at individualized education program (IEP) meetings; she was not a classroom teacher. She said that plaintiff had "serious" problems in reading and comprehending written materials, comprehending and doing math problems, and expressing ideas in written form. He had "obvious" problems (less severe than a "serious problem") in comprehending oral instructions, learning new material, recalling and applying previously learned material, and in applying problem solving skills in class discussions. (Tr. 257-64.)

Plaintiff submitted a function report in which he said he did not hear well, had trouble seeing things, and could not "understand a lot of stuff." He lived at home with his family. He did not prepare meals and did no yard or house work because he could not see. He had difficulty with memory, concentration, completing tasks, understanding, and following directions. (Tr. 301-08.)

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing in March 2016. (Tr. 34.)

Plaintiff was twenty years old. He was 6' 7" tall and weighed 428 pounds. He had been seen at a weight loss clinic and had started a protein diet. His weight made it harder for him to do things because he got out of breath if he did a lot of work. (Tr. 38-39.)

Plaintiff tried to get a driver's license in high school. He got a learner's permit but the state took it away after two weeks. He was taking driver's education classes, and he put the car in a ditch and

almost hit a pole because of his vision problems. He never got a license. He graduated from high school and took some drama classes at a community college. He was in a special education classroom in high school. Often, the teacher had to read the questions on a test to him. He had to quit community college because his sister got sick and could no longer drive him. (Tr. 40-45.)

Plaintiff testified that he had to hold written materials an inch from his face to be able to read them. He said that his function report was actually filled out by his sister. She read him the questions and wrote out his answers. He printed his name on the form. (Tr. 48-49.) He has to sit an inch from the television to see it. (Tr. 51.)

Plaintiff acted in some plays in high school. He only had very small parts with three or four lines. He was in a play at the community college in the first semester in which he had two lines. His teachers and his sister and father helped him learn his lines. In that semester, he took a drama class, a reading class, and study hall. His sister did his homework. For quizzes and tests, the teacher had to read the questions to him or they had to be in large print. In the second semester, he took only a drama class. He quit before the semester was over. He was on probation the second semester because of his poor grades from the first semester. (Tr. 54-59.)

Plaintiff testified that he did not do much around the house. He helped his sister do laundry once a week. (Tr. 63.) He could not use the microwave to cook a frozen meal because he could not understand the directions. (Tr. 71.) He enjoyed bowling, but his father had to tell him whether he hit any pins. (Tr. 73.)

Plaintiff was unable to learn how to tie his shoes or ride a bike. (Tr. 62, 64.)

A VE also testified. The ALJ asked him a hypothetical question that corresponded to the ultimate RFC findings. The VE testified that this person could do jobs such as brimer (applies powder

to plastic mold sheets), waxer (applying wax to speedometer and radio dials), and leaf tier (works in tobacco industry). (Tr. 78-84.)

The VE also testified that a person whose pace of production was ten to fifteen percent slower than average or who required redirection from a supervisor on how to do a task more than twice would not be employable. (Tr. 84-86.)

### 3. Medical Records

Plaintiff went to Marion Eye Center and Optical for his vision problems. In May 2012, he complained of blurred vision both at a distance and near in both eyes for years. He was diagnosed with exotropia, bilateral degenerative myopia and amblyopia.[3] (Tr. 576-80.) In February 2015, he complained of blurred vision even with his glasses. Examination showed peripapillary atrophy, myopic degeneration, and lattice degeneration in both eyes. (Tr. 755.)

In September 2014, Dr. Adrian Feinerman performed a consultative physical exam. Plaintiff was 6' 4" and weighed 437 pounds. Dr. Feinerman stated that he had been in special education classes but was able to read and write. He described the lenses in plaintiff's glasses as "very thick." His vision with glasses was 20/40 in the right eye and 20/100 in the left eye. Dr. Feinerman concluded that plaintiff had no physical limitations except for decreased vision, decreased hearing, and a slight speech impediment. Although he had decreased hearing, he was able to carry on a normal conversation. His speech was understandable despite his speech impediment. (Tr. 669-78.)

Harry J. Deppe, Ph.D., performed a consultative psychological exam in September 2014. He administered an IQ test. Plaintiff's full scale IQ was 73, which Dr. Deppe said indicated borderline intellectual functioning. Dr. Deppe said plaintiff would have difficulty performing highly complicated

---

[3] "Exotropia—a common type of strabismus—is the outward deviation of an eye (away from the nose)." Jeffrey Cooper & Rachel Cooper, *What is Strabismus: About Exotropia*, Optometrists Network, http://www.strabismus.org/ exotropia_eye_turns_out.html (visited Apr. 6, 2018).

work tasks. (Tr. 680-82.)

Plaintiff received primary health care from Moreland College Health Services. The records indicate that his sister generally accompanied him to the doctor's office. He had recurrent ear infections from 2012 through 2015. He was diagnosed with some hearing loss. (Tr. 584-666, 684-752.) He was started on medication for high blood pressure in January 2015. (Tr. 716-17.)

Plaintiff saw Dr. Pineda, a pulmonologist, for shortness of breath in March 2015. Pulmonary function testing was unremarkable. Dr. Pineda noted that he had recently been diagnosed with sleep apnea but could not tolerate the CPAP mask. Dr. Pineda suggested that plaintiff might be a good candidate for bariatric surgery for weight reduction. He referred to plaintiff's sister as his "caretaker" or "guardian." (Tr. 758-71.)

Plaintiff saw Dr. Ahuja, a bariatric surgeon, in early 2016. The doctor recommended surgery, but also recommended that he try to lose weight on a liquid protein diet prior to surgery. He noted that plaintiff had a history of "mental retardation." (Tr. 779-84.)

### 4. State Agency Consultant's Mental RFC Assessment

In September 2014, Howard Tin, Psy.D., assessed plaintiff's mental RFC based on a review of the file contents. He used an electronic version of an agency form that is commonly used for this purpose in social security cases. (Tr. 113-15.) The form consists of a series of questions and a list of mental activities. The consultant is asked to rate the applicant's limitations in these areas.

Dr. Tin answered "yes" to the question, "Does the individual have sustained concentration and persistence limitations?" He rated plaintiff as "moderately limited" in ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, and ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance.

He also rated plaintiff as moderately limited in ability to set realistic goals or make plans independently of others. In the section for narrative remarks, Dr. Tin wrote, "Claimant has difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods of time, however the person is capable of performing simple tasks." (Tr. 114-15.)

## Analysis

In his first point, plaintiff argues that the RFC assessment and the hypothetical questions posed to the VE were erroneous because they failed to account for his moderate limitation in maintaining concentration, persistence, or pace.

The ALJ's RFC assessment and the hypothetical question posed to the VE must both incorporate all of the limitations that are supported by the record. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). This is a well-established rule. *See Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (collecting cases). If the ALJ finds that a plaintiff has a moderate limitation in maintaining concentration, persistence or pace, that limitation must be accounted for in the hypothetical question posed to the VE; in most cases, limiting the plaintiff to simple, repetitive tasks or to unskilled work is not sufficient to account for moderate concentration difficulties. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010).

Here, the ALJ found that plaintiff had moderate difficulties in maintaining concentration, persistence or pace at step three of the sequential analysis when determining whether plaintiff's mental impairments meet or equal a listed impairment. (Tr. 15.) He noted that, while the step three determination is not a mental RFC assessment *per se*, the ultimate RFC assessment "reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." (Tr. 16.) Later, when explaining his RFC assessment, the ALJ gave "great weight" to Dr. Tin's opinion, noting

that Dr. Tin found that plaintiff had moderate limitations in maintaining concentration, persistence or pace. (Tr. 23.) However, neither the hypothetical question posed to the VE nor the RFC assessment mentioned a limitation in concentration, persistence or pace. Rather, the ALJ limited plaintiff to understanding, remembering, and carrying out short, simple instructions at a consistent pace, but not complex instructions.

The Seventh Circuit Court of Appeals has repeatedly held, with exceptions not applicable here, that a limitation to simple, repetitive tasks or unskilled work does not adequately account for a moderate limitation in maintaining concentration, persistence or pace. In *Stewart*, a case decided in 2009, the Court observed, "The Commissioner continues to defend the ALJ's attempt to account for mental impairments by restricting the hypothetical to 'simple' tasks, and we and our sister courts continue to reject the Commissioner's position." *Stewart*, 561 F.3d at 685. The Court has reaffirmed that position several times in recent years. *O'Connor-Spinner,* 627 F.3d at 620*; Yurt v. Colvin,* 758 F.3d 850, 857 (7th Cir. 2014); *Varga v. Colvin,* 794 F.3d 809, 814 (7th Cir. 2015)*; Taylor v. Colvin,* 829 F.3d 799, 802 (7th Cir. 2016).

The Commissioner defends the ALJ's decision by arguing that none of plaintiff's doctors assessed any limitations related to concentration, persistence or pace. That is true, but irrelevant; the state agency consultant found that plaintiff had moderate limitations in this area, and the ALJ agreed that plaintiff had moderate limitations in that area and said that the RFC assessment would reflect those limitations.

Plaintiff cited *Stewart* in his brief (Doc. 15 at 8-9), but the Commissioner does not mention it in hers. She defends the ALJ's decision by arguing that Dr. Tin "translated" his finding that plaintiff had a moderate limitation in concentration, persistence, or pace into a mental RFC assessment. She relies on

Dr. Tin's statement that plaintiff "had difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods of time, however the person is capable of performing simple tasks" (Doc. 21 at 6-7). However, the Seventh Circuit Court of Appeals has been very clear that a limitation to simple instructions or simple, routine tasks does not adequately account for a moderate limitation in maintaining concentration, persistence, or pace. "The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *O'Connor-Spinner*, 627 F.3d at 620.

Further, Dr. Tin's statement is not as supportive of defendant's position as she thinks it is; the fact that plaintiff is "capable of performing simple tasks" does not mean that he is capable of sticking with those simple tasks for an entire workday in view of his difficulty in maintaining attention and concentration for extended periods of time.

Plaintiff's point regarding the ALJ's assessment of his subjective allegations is also well-taken. In concluding that plaintiff's statements about the effects of his symptoms were not entirely believable, the ALJ said he considered the medical treatment and plaintiff's activities of daily living, among other factors. (Tr. 19.) As defendant points out, these are appropriate factors for consideration. However, in this case, the manner in which the ALJ considered these factors does not lend support to his conclusion.

Plaintiff's impairments include borderline intellectual functioning, a learning disability, and impaired vision. There is no "medical treatment" for the first two conditions, and the record reflects that plaintiff wears glasses and undergoes regular vision exams. There is no suggestion in the medical evidence that plaintiff has declined or failed to follow up on any recommended treatment for these conditions. Therefore, consideration of the medical treatment offers little support for the ALJ's

conclusion.

As for daily activities, the ALJ remarked several times that plaintiff attended college, was able to "function independently" in college, and only stopped attending college classes when his sister could no longer drive him. He also noted that plaintiff acted in plays in high school and college. (Tr. 14-15, 19.) This characterization of the evidence greatly overstates plaintiff's level of functioning. He attended only one full semester at community college, dropping out in his second semester. In the first semester, he took three classes: drama, reading, and study hall. His sister did his homework, and a teacher had to read the questions on quizzes and tests out loud to him or they had to be in large print. His grades were so bad that he was on probation the second semester. He took only a drama class in the second semester and quit before the semester was over. In addition, his acting career consisted of very small parts in some plays in high school and one in college. He had two lines in the college play, and he needed help memorizing his lines. (Tr. 54-59.) These activities hardly demonstrate that plaintiff was able to function independently in college. An ALJ fails to build the required logical bridge from the evidence to his conclusion where he relies on evidence that does not support the proposition for which it is cited. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).

The above errors require remand. "If a decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir., 2012)(internal quotations omitted).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinion in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

**Conclusion**

The Commissioner's final decision denying George W. Motsinger's application for Child Disability Benefits and SSI benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of 42 U.S.C. § 405(g). The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE:   April 18, 2018**

<u>s/ J. Phil Gilbert</u>
**J. PHIL GILBERT**
**DISTRICT JUDGE**
